# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **J.D. THOMPSON, III** | **CIVIL ACTION NO. 3:11 -cv-0337** |
| **LA. DOC #106841** | |
| **VS.** | **SECTION P** |
| | **JUDGE ROBERT G. JAMES** |
| **MAJOR DONNIE ADAMS, ET AL.** | **MAGISTRATE JUDGE KAREN L. HAYES** |

# REPORT AND RECOMMENDATION AND
## ORDER DENYING EMERGENCY INJUNCTIVE RELIEF

*Pro se* plaintiff J.D. Thompson, III, proceeding *in forma pauperis*, filed the instant civil rights complaint pursuant to 42 U.S.C. §1983 on March 1, 2011. Plaintiff is an inmate in the custody of Louisiana's Department of Public Safety and Corrections. When he filed this complaint he was incarcerated at the Union Parish Detention Center (UPDC), Farmerville, Louisiana, and he complained that the defendants – Acting Warden Donnie Adams and Nurse Osbourne – failed to provide prompt and appropriate medical care and treatment for his pre-existing cardiac condition during the 3 month period he was incarcerated at that facility from January 7 to March 24, 2011.

He prayed for injunctive relief – an order directing the defendants to provide him with his previously ordered medication – and compensatory damages for mental anguish, pain and suffering, and emotional distress in the amount of $250,000. In a subsequent pleading he requested that criminal charges of attempted murder be filed against defendants Adams and Osbourne.

Plaintiff was transferred to the River Bend Detention Center (RBDC) on March 24, 2011. On April 19, 2011 he filed an Amended Complaint and a Motion for "Emergency Injunction Relief" apparently requesting that he be provided various cardiac medications on an emergency basis. He

also requested $700,000 in compensatory damages against RBDC "... for cruel and unusual punishment, emotional distress, retaliation, pain and suffering, medical neglect, malpractice..." [Doc. #11]

These matters have been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the Court. For the following reasons it is recommended that the complaints against the defendants Adams, Osbourne, and RBDC be **DISMISSED WITH PREJUDICE** for failing to state a claim for which relief may be granted; and, that plaintiff's Motion for Emergency Injunctive Relief [Doc. #11] be **DENIED.**

### *Background*

### *1. Original Complaint [Doc. #1]*

In his original complaint filed on March 1, 2011, plaintiff alleged that he is an inmate in the custody of Louisiana's Department of Public Safety and Corrections.  He is serving a 3-year hard labor sentence imposed following his conviction for unspecified felonies in some unspecified jurisdiction.  He was initially incarcerated at the UPDC on January 7, 2011.  On some unspecified date after his arrival he advised Nurse Osbourne of various pre-existing medical conditions, namely congestive heart failure, coronary artery disease, and atrial fibrillation.[1]  Plaintiff also advised

---

[1] Coronary Artery Disease or CAD happens when the arteries that supply blood to heart muscle become hardened and narrowed. This is due to the buildup of cholesterol and other material, called plaque, on their inner walls. This buildup is called atherosclerosis. As it grows, less blood can flow through the arteries. As a result, the heart muscle cannot  get the blood or oxygen it needs. This can lead to chest pain (angina) or a heart attack. Most heart attacks happen when a blood clot suddenly cuts off the heart's blood supply, causing permanent heart damage. Over time, CAD can also weaken the heart muscle and contribute to heart failure and arrhythmias.

Heart failure is a condition in which the heart cannot pump enough blood throughout the body. Heart failure does not mean that the  heart has stopped or is about to stop working. It means that the heart is not able to pump blood the way it should. The weakening of the heart's pumping ability causes (1) Blood and fluid to back up into the lungs; (2) The buildup of fluid in the feet,

Osbourne that he has "... mini stroke..." and that he was previously prescribed the following

medications, Coumadin®, Lovenox® injections twice daily to thin his blood and eliminate blood

clots and some heart medication "that begins with the letter c..." to  prevent atrial fibrillation.[2]

Plaintiff also advised that he must "... take a PTINR...[3]" from time to time to ensure that he is taking

---

ankles and legs - called edema; and/or (3) Tiredness and shortness of breath. The leading causes
of heart failure are coronary artery disease, high blood pressure and diabetes. Treatment includes
treating the underlying cause of your heart failure, medicines, and heart transplantation if other
treatments fail.

Atrial fibrillation is a common type of heart arrhythmia or problem with the speed or rhythm of
the heartbeat.  Symptoms may include palpitations, shortness of breath, weakness or difficulty
exercising, chest pain, dizziness or fainting, fatigue or confusion. Treatments include medicines,
medical procedures, and lifestyle changes.

See *MedlinePlus, A Service of the U.S. National Library of Medicine and the National Institutes
of Health*, on line at http://www.nlm.nih.gov/medlineplus/healthtopics.html


[2] Coumadin® or warfarin is used to prevent blood clots from forming or growing larger in
the blood and blood vessels. It is prescribed for people with certain types of irregular heartbeat,
people with prosthetic (replacement or mechanical) heart valves, and people who have suffered a
heart attack. Warfarin is also used to treat or prevent venous thrombosis (swelling and blood clot
in a vein) and pulmonary embolism (a blood clot in the lung). Warfarin is in a class of
medications called anticoagulants ('blood thinners'). It works by decreasing the clotting ability of
the blood. Lovenox® or Enoxaparin is used to prevent blood clots in the leg in patients who are
on bedrest or who are having hip replacement, knee replacement, or stomach surgery. It is used in
combination with aspirin to prevent complications from angina (chest pain) and heart attacks. It
is also used in combination with warfarin to treat blood clots in the leg. Enoxaparin is in a class
of medications called low molecular weight heparins. It works by stopping the formation of
substances that cause clots.

See *MedlinePlus, A Service of the U.S. National Library of Medicine and the National Institutes
of Health* at http://www.nlm.nih.gov/medlineplus/druginformation.html

[3] The PT and INR or Prothrombin Time and International Normalized Ratio evaluates the
ability of blood to clot properly, it can be used to help diagnose bleeding. It is often used in
conjunction with other tests to evaluate the function of all coagulation factors. The International
Normalized Ratio (INR) is used to monitor the effectiveness of blood thinning drugs such as
warfarin (Coumadin®). For patients taking an anti-coagulant drug, the physician will check
PT/INR regularly to make sure that the prescription is working properly and that the  PT/INR is

the appropriate dose of Coumadin®.

Osbourne explained to plaintiff that she needed  evidence in addition to plaintiff's statement with regard to his diagnosis and treatment protocol; however, she allegedly  refused his request that she obtain his medical records from previous health care providers.

According to plaintiff, while at UPDC he  made numerous sick calls complaining of "pain and numbness in my legs and arms and chest..." and a swollen leg. His requests for treatment were ignored.  Plaintiff submitted a formal grievance but it too was ignored.  Plaintiff then spoke with Acting Warden Adams and requested that Adams speak to Nurse Osbourne on his behalf; he also requested a transfer to the Rayburn Corrections Center, which is located near the LSU Medical Center in Bogalusa, Louisiana where his treating physician, Dr. Colon,  is employed. Adams agreed to  look into both requests, but apparently did not do so in an expeditious manner.

### 2. First Amended Complaint [Doc. #4]

On March 15, 2011, plaintiff filed an amended complaint. He alleged that on March 5, 2011, he was transported to the Union General Hospital at 2:30 a.m. after he complained of chest and arm pain, numbness, and tingling.  An EKG and CT Scan were done. These diagnostic tests revealed that plaintiff had not suffered, nor was he then experiencing a heart attack, stroke, or blood clot. Plaintiff was given aspirin and a second EKG was performed. He was examined by a physician who prescribed an injection for pain and thereafter plaintiff was discharged and returned to UPDC. Presumably, the physician who examined and treated plaintiff did not prescribe any of the medications plaintiff now desires.  According to plaintiff, prior to discharge, the hospital nurse

---

appropriately prolonged. There is no set frequency for doing the test. One's physician will order the tests often enough to make sure that the drug prescribed  is producing the desired effect - that it is increasing clotting time to a therapeutic level without causing excessive bleeding or bruising. Lab Tests Online® at http://www.labtestsonline.org/understanding/analytes/pt/test.html#when

contacted Nurse Osbourne and advised her to obtain plaintiff's prior medical record.

On March 7, 2011, plaintiff was summoned to Nurse Osbourne's office. She asked plaintiff to provide the names of previous health care providers or facilities and plaintiff advised her that he was previously treated at the LSU Medical Center, Bogalusa, and at hospitals in Alabama and Mississippi.  Plaintiff executed a medical release form.

On March 12, 2011, at 7:40 a.m., plaintiff reported a "small" nose bleed to one of the corrections officers.  He asked to be taken to the hospital to see a physician,  but since the prison medical office was closed for the weekend, his request was denied.  At 9:00 a.m. while walking in the prison yard plaintiff noted that his hands were cold and "dark blue, dark purple." He showed his hands to a corrections officer who advised that there was nothing that could be done until Monday when the nursing staff returned.

Plaintiff complained that he was charged for his hospital visit and would be charged for his request for medical attention which he filed that weekend. He also requested that criminal charges be filed against the defendants and a request for a transfer to the Rayburn Corrections facility near his home.

### 3. Notice of Change of Address [Doc. #5], Criminal Complaint [Doc. #7], and Request for Appointment of Counsel [Doc. #8]

In a letter dated March 25, 2011, which was received and filed on March 29, 2011, plaintiff advised the court that he was transferred to RBDC on March 24, 2011. According to plaintiff, he spoke to RBDC's nurse, Ms. Sylvia, and advised her of his medical condition. Plaintiff acknowledged that Nurse Sylvia was ".. in the process of trying to get the medication I need..." Plaintiff expressed a desire to maintain the civil action against defendants Adams and Osbourne but expressed no grievance against RBDC or its staff.

In a letter dated March 31, 2011, which was received and filed on April 5, 2011, plaintiff forwarded a copy of a document he purportedly filed with the Ouachita Parish Sheriff's Office. The document, entitled "Criminal Complaint" requesting the Sheriff to lodge attempted murder charges against defendants Adams and Osbourne.

On the same date plaintiff requested a "state appointed attorney." [Doc. #8] On April 7, 2011, the request for counsel was denied. [Doc. #9]

### 4. Second Amended Complaint and Motion for Emergency Injunctive Relief [Docs. #10-11]

On April 19, 2011, plaintiff filed a "Motion to Amend ... [and] Memorandum Brief in Support... [and] Emergency Injunction Relief." [Docs. #10-11]

Plaintiff alleged therein that he "fears for the safety of his life and ask [sic] that this Emergency Injunction Relief be acted upon immediately due to the seriousness of his medical condition as well as the continuous denial of the appropriate medical treatment needed that would prevent a substantial risk of serious harm, such as a serious stroke or even death..." Plaintiff then alleged that "symptoms ... are appearing more frequently..." However, he neither specified the symptoms nor alleged the frequency that he was experiencing those symptoms.

Plaintiff again alleged his need to be treated with Coumadin® in order to prohibit blood clots which may result in stroke or death. He claims to need blood monitoring and the PTINR test.

In support of his motion and amended complaint, he alleged the following – On April 12, 2011, plaintiff was examined by a physician, Dr. Bally.  Bally advised plaintiff that he was in possession of plaintiff's medical records from LSU Medical Center. Bally observed that while plaintiff had a previous history of atrial fibrillation, he was not experiencing the condition at the time of Bally's examination. Accordingly, Bally refused to prescribe or provide the medication requested by plaintiff, notwithstanding the fact that plaintiff's hand was dark purple.

Plaintiff claims that he awoke at 6:40 a.m. on April 16, 2011; his left arm and hand were numb and his hand had again turned a deep purple in color. Plaintiff advised Sgt. Gilmore of his condition and requested him to document it in the log book. Lt. Killion was summoned, however, upon speaking to plaintiff, he advised that he was not a health care professional and therefore could be of no assistance. He further advised plaintiff to raise medical issues during the week and not the weekend. Plaintiff then approached Nurse Dean who happened to be at the facility, but Nurse Dean opined that plaintiff's condition was not a medical emergency and refused any assistance. According to plaintiff, he walked around the dorm to adjust his blood flow and took Tylenol.

Plaintiff claimed that he experiences the complained of symptoms daily. Plaintiff claimed that Nurse Dean, Nurse Osbourne, and Dr. Bally "should have known the serious risk..." He acknowledged that Bally and Dean both have access to his prior medical records and that they should have consulted with Dr. Colon, plaintiff's physician at LSU concerning appropriate treatment of plaintiff's condition.

Plaintiff prayed for a transfer to the Forcht-Wade Corrections Center. He also asked that RBDC compensate him "... for cruel and unusual punishment, emotional distress, retaliation, pain and suffering, medical neglect, malpractice in the amount of $700,000.

### *Law and Analysis*

### *1. Screening*

When a prisoner is allowed to proceed *in forma pauperis* in a suit against an officer or employee of a governmental entity pursuant to 42 U.S.C. §1983, the court is obliged to evaluate the complaint and dismiss it without service of process, if it is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C.1915A; 28 U.S.C.1915(e)(2). *Ali v. Higgs*, 892 F.2d 438, 440 (5th Cir.1990).

A civil rights complaint fails to state a claim upon which relief can be granted if it appears that no relief could be granted under any set of facts that could be proven consistent with the allegations of the complaint. Of course, in making this determination, the court must assume that all of the plaintiff's factual allegations are true. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir.1998).

A hearing need not be conducted for every *pro se* complaint. *Wilson v. Barrientos*, 926 F.2d 480, 483 n. 4 (5th Cir.1991). A district court may dismiss a prisoner's civil rights complaint as frivolous based upon the complaint and exhibits alone. *Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir.1986).

District courts must construe *in forma pauperis* complaints liberally, but they are given broad discretion in determining when such complaints are frivolous. *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir.1994).

A civil rights plaintiff must support his claims with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. . *Ashcroft v. Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 1949,  173 L.Ed.2d 868 (2009); *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir.1995). Nevertheless, a district court is bound by the allegations in a plaintiff's complaint and is "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint." *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d at 97.

Courts are not only vested with the authority to dismiss a claim based on an indisputably meritless legal theory, but are also afforded the unusual power to pierce the veil of the factual allegations and dismiss those claims whose factual contentions are clearly baseless. *Neiztke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

Plaintiff's original complaint set forth his claim and the basis for his cause of action; he has

filed amended complaints and other pleadings which provide additional details and facts in support of his claims for relief. He need not be permitted further amendment because his claims – taken as true for the purposes of this report – fail to state a claim for which relief may be granted.

### 3. Medical Care

Plaintiff is a convict who complains that he has been denied prompt and appropriate medical care by Nurse Osbourne and Acting Warden Adams at the UPDC, and by corrections officers and various health care professionals, including Dr. Bally at RBDC.

As plaintiff elsewhere noted, the constitutional right of a convicted prisoner to safe conditions of confinement and prompt and adequate medical care is based upon the Eighth Amendment's prohibition of cruel and unusual punishment. Rights guaranteed under the Eighth Amendment are violated only if the defendants act with deliberate indifference to a substantial risk of serious harm which results in injury. Deliberate indifference requires that the defendants have subjective knowledge of the risk of harm. Mere negligence or a failure to act reasonably is not enough. The defendants must have the subjective intent to cause harm. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Thus, in order to establish an actionable constitutional violation a plaintiff must allege facts tending to establish that the defendants were deliberately indifferent to his serious medical needs and safety. *Thompson v. Upshur County, Texas*, 245 F.3d 447, 457 (5th Cir.2001). A showing of deliberate indifference with regard to medical treatment requires the inmate to submit evidence that prison officials " 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001) (citation omitted). Plaintiff's pleadings fall far short of alleging facts sufficient to establish deliberate

indifference on the part of any of the named defendants or any of the other corrections officers or healthcare officials identified in his pleadings.  As a matter of fact, it is manifestly obvious that plaintiff simply disagrees with the diagnosis and course of treatment that were recommended by the unnamed physician who examined him on March 5, 2011, at the Union Parish General Hospital and by Dr. Bally who examined him on April 12, 2011, while he was incarcerated at RBDC.  Plaintiff's disagreement with the diagnosis and course of treatment that was ultimately provided to him falls far short of establishing deliberate indifference since mere disagreement with medical diagnosis or treatment does not state a claim under the Eighth Amendment. *See Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir.1997), citing *Young v. Gray*, 560 F.2d 201, 201 (5th Cir.1977); *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir.1985).

In addition, plaintiff alleged that Nurse Dean, Nurse Osbourne, and Dr. Bally "should have known the serious risk..." because Bally and Dean both had access to his prior  medical records and they could have consulted with Dr. Colon, plaintiff's physician at LSU Medical Center, concerning appropriate treatment of plaintiff's condition. Plaintiff thus implies negligence or malpractice on the part of these defendants.  However, deliberate indifference is not the equivalent of negligence; deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Under the deliberate indifferent standard, it is not sufficient that defendants should have known of a substantial risk; they must have actual knowledge of the risk and must thereafter have ignored it.  In other words, a civil rights  plaintiff must allege and prove that each of the  defendants knew of and then disregarded an excessive risk of injury to him, and,  that they were both aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed, and that they drew that inference. *Id.* at 837.

Thus, under the standard of deliberate indifference, evidence of unsuccessful medical treatment, negligence, neglect, or even gross medical malpractice is insufficient. *Gobert v. Caldwell*, 463 F.3d 339, 347 (5th Cir.2006); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir.1991); see also *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.1999) ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."); *Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir.1993) ("It is firmly established that negligent or mistaken medical treatment or judgment does not implicate the eighth amendment and does not provide the basis for a civil rights action.").

In short,  "[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment." *Gobert*, 463 F.3d at 346. For that reason, mere disagreement with medical diagnosis and  treatment does not state a claim for deliberate indifference to serious medical needs under the Eighth Amendment. *Id.* Even if a lapse in professional judgment occurred, any such failure amounts to mere negligence or malpractice, and not a constitutional violation. *Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir.1999). Federal constitutional protections are not violated merely because an inmate's medical treatment was unsuccessful or because a condition persisted despite treatment. *Gobert*, 463 F.3d at 346.

Plaintiff also complained that he is charged for medical services, such an allegation fails to state a claim for which relief might be afforded. The policy or procedure he complains of is apparently a "co-pay" policy or fee-for-service program which requires inmates to bear part of the cost of their medical treatment. Courts have found these polices constitutionally permissible if they do not interfere with timely and effective treatment of serious medical needs. *Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir.1997) (co-pay policy)*; Shapley v. Nevada Bd. of State Prison Comm's*, 766 F.2d 404 (9th Cir.1985) (co-pay policy); *Cameron v. Sarraf*, 2000 WL 33677584, at *3-5

(E.D.Va. March 17, 2000) (No. CIV.A.98-1227-AM.) (co-pay policy); *Reynolds v. Wagner*, 936 F.Supp. 1216, 1225-1227 (E.D.Pa.1996) (fee-for-service-program); *Johnson v. Dept. of Public Safety and Correctional Services*, 885 F.Supp. 817 (D.Md.1995) (co-pay policy). See also *Hudgins v. DeBruyn*, 922 F.Supp. 144, 151 (S.D.Ind.1996) (prison policy which provided that inmates could obtain over-the-counter medicine at cost from institution commissary or as part of necessary treatment for serious medical condition did not constitute cruel and unusual punishment even though former policy generally provided medication free of charge in conjunction with inmate's use of sick-call process; inmate's serious medical needs would be met whether inmate was indigent or not).

Simply stated, nothing in Constitution guarantees inmates the right to be entirely free from costs associated with medical care. *Reynolds*, 128 F.3d, at 175. It is only when necessary medical care is denied to impecunious inmates that the Eighth Amendment is implicated. See, e.g., *Collins v. Romer*, 962 F.2d 1508, 1514 (10th Cir.1992) (affirming district court finding that statute with no exceptions to the co-payment requirement would be unconstitutional because it would deprive an inmate of meaningful access to medical care); *Johnson*, 885 F.Supp. at 820 (holding statute constitutional "because the policy mandates that no one shall be refused treatment for an inability to pay, [and] the co-pay policy will not result in a denial of care, even for inmates who abuse the system").

### 3. Original Prayer for Injunctive Relief and Motion for Emergency Injunction

Both in his original complaint [Doc. #1] and in his Motions filed on April 19, 2011 [Docs. # 10-11], plaintiff prayed for injunctive relief. In the original complaint plaintiff implied that he was entitled to an order directing the UPDC defendants, Osbourne and Adams, to provide his medication. Plaintiff's transfer from UPDC to RBDC rendered that request moot since the transfer of a prisoner out of an allegedly offending institution generally render his claims for injunctive relief moot.

*Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (*per curiam*)
(plaintiff's individual suit challenging parole procedures mooted by release absent "demonstrated
probability" that he would again be subject to parole board's jurisdiction); *Cooper v. Sheriff,
Lubbock County, Tex*., 929 F.2d 1078, 1081 (5th Cir.1991) (*per curiam*) (holding that prisoner
transferred out of offending institution could not state a claim for injunctive relief).

Plaintiff also demanded that the UPDC defendants be criminally prosecuted for attempted
murder or some other charge. The decision whether to prosecute or file criminal charges against an
individual lie within the prosecutor's discretion, and private citizens do not have a constitutional
right to have an individual criminally prosecuted. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619
(1973); *United States v. Batchelder*, 442 U.S. 114, 124 (1979); *see also Oliver v. Collins*, 914 F.2d
56, 60 (5th Cir. 1990). Therefore, to the extent that plaintiff seeks such an order from this court, he
has failed to state a claim for which relief may be granted.

Plaintiff also seeks Emergency Injunctive relief – presumably an injunction directing his
present custodians at RBDC to provide the medication and treatment allegedly ordered by Dr. Colon
prior to  plaintiff's incarceration. Injunctive relief in the form of "superintending federal injunctive
decrees directing state officials" is an extraordinary remedy. *See Morrow v. Harwell*, 768 F.2d 619,
627 (5th Cir.1985).  In order to obtain a preliminary injunction or temporary restraining order, a
plaintiff must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial
threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened
injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the
preliminary injunction will not disserve the public interest. *See Planned Parenthood of Houston &
Southeast Texas v. Sanchez*, 403 F.3d 324, 329 (5th Cir.2005).

As shown above, plaintiff has not demonstrated that he will likely prevail on the merits of

his claims. The facts alleged by plaintiff establish that he was twice examined by physicians.  First, plaintiff was examined and treated  by an unnamed physician at the Union Parish Hospital on March 5, 2011. Diagnostic tests performed at the request of that physician revealed that plaintiff was not experiencing any cardiac related problems.  Second, plaintiff was examined, diagnosed, and treated by Dr. Bally on April 12, 2011. On that occasion, Dr. Bally advised plaintiff that he was in possession of plaintiff's medical records from Dr. Colon at LSU. Dr. Bally observed the discoloration of plaintiff's hand and arm. Nevertheless, he did not order plaintiff's the resumption of the medication previously ordered,  nor did he find any cardiac involvement of an emergency nature since he apparently discharged plaintiff back to the custody of the RBDC following his examination.

By the same token, the findings of these physicians also demonstrate that plaintiff is unlikely to be able to establish the threat of irreparable injury. In short, plaintiff is not entitled to Emergency Injunctive Relief and his motions should therefore be denied.

### *Order and Recommendation*

Therefore,

Plaintiff's Motions for Emergency Injunction Relief  [Docs # 10 and 11] are **DENIED;** and, further,

**IT IS RECOMMENDED** that plaintiff's civil rights complaints be **DISMISSED WITH PREJUDICE** for failing to state a claim on which relief may be granted in accordance with the provisions of 28 U.S.C. § 1915(e)(2)(B)(i) and (ii).

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to

another party's objections within fourteen (14) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

In Chambers, Monroe, Louisiana, April 21, 2011.


KAREN L. HAYES
U. S. MAGISTRATE JUDGE